Please support Stephen Bergstein for the plaintiff appellant. We have two issues here on appeal. The first has to do with the admissibility of the expert opinion, and the second has to do with whether a plaintiff proposed reasonable accommodations. Let me start with the expert witness. It was an abuse of discretion to exclude Dr. Williams' opinion. Let me start by just reminding everyone of what the standard is on expert testimony when you're not involving scientific study, when you're relying on the expert's personal experience, whether the personal experience reliably applies to the facts. And second is a presumption of admissibility for expert testimony. The Supreme Court has said we have faith in the adversary's system. So you don't need a slam-dunk expert opinion for it to be admissible. But the reality is Dr. Williams testified, or she wrote that for more than 20 years she was performing these procedures, lengthy, challenging endoscopies, primarily while seated, and even during emergencies without any problems in safety. And this was her default position, so, quote, almost always feasible to do it this way. That's what a plaintiff wanted in his first reasonable accommodation. Isn't the question how that experience bore on your client's experience as an expert of numbness, shooting pain in his arms, and upper body weaknesses, and not just the ergonomic posture? The upper left pain, that's complex because the district court made reference to that at page 16 of the opinion, but that was connected with his inability to use heavy equipment such as a lead apron. And that was the second accommodation. But that's not an essential job task for the plaintiff. He didn't have to be doing the ERCPs. It was discretionary on his behalf. So the plaintiff's affidavit said it's wrong to assume I could barely lift the endoscope with my left arm. That's page 1742. That's his affidavit, paragraph 43. And the final medical report from September 2017 doesn't say that plaintiff cannot hold the endoscope. So whether he can hold the endoscope or not is at best an issue of fact for the jury. But the plaintiff's doctor, in light of his entire medical history and his medical and the pain he was experiencing, said he can do all this while seated. And we know from Dr. Williams that it can be done while seated. So maybe the bigger problem was, I guess I'm not understanding how the proposed three accommodations alleviated concerns about the arm and upper body issues. Well as I said, his affidavit says that it's not true that he could barely lift the endoscope. And he knows how he feels. He's a doctor. He's able to make that assessment. Reviewing the record, I think the inability to lift your arm mostly had to do with the second accommodation, which was the lead clothing you wear for these X-rays. It doesn't really relate to what you're doing under the first accommodation when you're doing these endoscopes. Well, no, why is that? Whether you're standing or sitting, I understand endoscopy to involve both of the surgeon's hands. And in fact, typically holding the scope, it sounds like for the record, with the left hand. And there's some weight to that. Why would, explain why it's not, doesn't translate to the first issue. It's, there's a fact issue whether he can hold the endoscope. It's not in the September 2017 record from his doctor. It's in the May 2017 record that he has difficulty with his left arm. It's not in the September 2017 memo. And as I said, his affidavit says that it's not really a problem. So if it's not really a problem, then there's an issue for the jury. And this dovetails with the first reasonable accommodation. If the expert says that you can do this type of work while seated, even during emergencies, then it's a plausible reasonable accommodation. You know, that's all the plaintiff has to show in a case like this is that it's plausible. I would say we disagree with you on the expert testimony that the district court did not abuse its discretion in excluding that. What other evidence is there that endoscopies can be performed safely seated down by your client? Is it just his own testimony? His testimony, he can do it. It's plausible. You know, even if this court rejects the expert testimony, you still know from the expert report that there are doctors who do this work, who do it while seated. If that's the case, then we do have a plausible accommodation. You don't have to show it's an airtight accommodation, but it puts the burden now on the employer to show we can't do this. This is an undue burden. And they're really raising a direct threat defense, right, that this is a serious threat to health and safety. If you're raising a direct threat offense in an ABA case, then you need solid, it's a heavy burden to satisfy this rule, this defense. And the regulations show you need the best available objective information to support the defense. They didn't produce that in this case. So we have a plausible accommodation. On its face, it's plausible. It's not inherently impossible to do what he's doing. Where is the best available objective information relied upon by the hospital to say, no, we can't do this? All they have is Dr. Pochapin, who works in that department, declared himself an expert during deposition. He says, you can't do this. I'm telling you now, you don't do this, we don't do it here, and it can't be done. That's not satisfying the direct threat defense. You need something more than that. You need some type of study. It's just not there. And it's certainly not in the memo that they wrote up after conferring amongst themselves that the plaintiff cannot enjoy this reasonable accommodation. And that dovetails with the interactive process. There was no real interactive process here. They consulted amongst themselves, right, but they didn't work with plaintiff to see if this can happen. Now, even if this Court says Dr. Williams's report is not admissible, we do know from the report that there are doctors who do this work, who do it while seated. Pochapin testified he did not do any studies, he didn't call other hospitals, he didn't do any independent inquiry other than to say, you can't do this here. You can call other hospitals and say, what are you doing over there with a doctor who needs to be seated for a lengthy procedure? Are there special chairs with rollers? Williams has a special chair. It's in her report. It's on wheels, it's a wide seat, you can move around. They didn't do any of that independent inquiry. And they certainly didn't work with plaintiff to see what can work out. That's the interactive process. The interactive process is not simply saying, no, it doesn't work, come up with something better or you're fired, which is what they said to him. And he was therefore fired. That's not working with the plaintiff to see what can be done to make such an accommodation work. So for these reasons, summary judgment was improper. Thank you. Thank you. You're reserved a few minutes for rebuttal. Ms. Nakabara. Good morning, Your Honor. Angela Nakabara for Appellee NYU Langone. The record evidence overwhelmingly supports the district court's decision. Judge Broderick issued a 29-page decision that was sound and reasoned. And it was clear to Judge Broderick, and it continues to be clear through the record, that NYU's inability to grant the appellant's requested accommodations was absolutely and completely rooted in NYU's commitment to safety of its patients. I'm sorry to jump in, but the left upper extremity issue has been large in this case. If the only constraint were that he needs to operate sitting down, then I think the rationale for excluding Dr. Wayne's testimony goes away. I think that whole issue has a very different flavor. I'm trying to figure out how we think about this left upper extremity when the stated limitations that drove the accommodation request don't reflect that limitation. And the hospital didn't use its ability to get an IME to establish that limitation. Can you help me understand how we can think about that limitation as an established fact in the absence of an IME, or at least as a reasonable basis for the hospital's decision? Absolutely, Your Honor. So respectfully, I would disagree that the only issue is the extremity to the upper left. If you review, it's very clear in Dr. Assina's assessments of Dr. Abel-Sayed, his own admission, the doctor admitted that in addition to the pain in the upper left extremities that resulted in numbness to his hands, he also experienced the same issues with regard to his legs. He would get numbness through his legs that would shoot down. So he had difficulties sitting. He had difficulties standing. But what you're doing now is describing something that sounds like an IME by the defendant on paper rather than a medical IME. You're looking at the medical records, and you're constructing an alternate set of limitations, right, which may have been very well supported had NYU done that. But can somebody come in and say, oh, even though these are the accommodations you're asking for and these are the limitations you've documented, without doing our own IME, we've concluded you have these other limitations that you deny. And on the basis of those other limitations, we're going to conclude you can't do this. So here it was absolutely appropriate because what they're basing that on are Dr. Abel-Sayed's own admissions in his doctor's records about what those issues were. But were those admissions contemporaneous with the return to work and the request for accommodation? Yes, absolutely. So one of the things that I think is very important to keep in mind here is that when Dr. Acina issues the final assessment and clears Dr. Abel-Sayed to go to work, also simultaneously says nothing has changed. And when you look at the prior reports that were submitted by Dr. Acina, all of this is covered in there. The fact that in addition to the upper extremities, and again, let's be clear, we're not just talking, it's not just pain, you know, to the upper extremities. So all of that was in there. And so Dr. Acina is saying, hey, none of this has changed. And in all of those prior reports, it's Dr. Abel-Sayed who is admitting, he's saying he has trouble, he can't hold the scope, he has trouble lifting the scope, he has trouble lifting his hands. And so you cannot expect, it would be completely unreasonable and reckless for Dr. Pachepin to look at the proposed accommodations with blinders and say, okay, Dr. Acina is saying nothing's changed, but we're going to clear him to work with these accommodations. He has to look at, when you're saying nothing has changed, okay, what were the issues? Right. So insofar as Dr. Pachepin offered an opinion about just the fact of operating from a seated position, primarily from a seated position, without the arm, did he have a greater scientific basis for offering those opinions than Dr. Williams who had decades of experience actually doing it? Absolutely. So first and foremost, it starts with, you know, I want to, I'll take issue with the fact that Dr. Pachepin didn't just merely work in the GI unit. He ran the GI unit. And he is a world-renowned gastroenterologist, and there's no question about his expertise. And I think there's no way to separate, when you're looking at what Dr. Williams is saying, that what she is saying is based on limited information. It's almost impossible to say that we can cut and we can slice and put into sort of vacuums the issues that Dr. Abel-Sayed had. So I think what you're saying is the upper extremity is necessarily central to this analysis. We couldn't simply say upper extremity or not. There's no dispute of fact as to whether an endoscopy or not is a good idea. I mean, endoscopic procedures can be performed from a seated position. It really is the upper left upper extremity. Well, it's certainly a contributing factor. I mean, I think Dr. Pachepin took the position and continues to take the position that he would not allow anyone at NYU to be performing these procedures in a seated position because he does not believe that it is safe. It always goes back to safety. So could it be done, right? Well, anything could be done. But the analysis for the hospital here is always and is always going to come back to could it safely be done. Right. But again, the question here, we're in summary judgment. And so we've got to decide whether there's a dispute of issue of fact. We have one gastroenterologist who's never actually tried it and wasn't able to identify any scientific literature to prove it. And then we have another gastroenterologist who's actually practiced safely for years, also has a leadership position in, I think, an academic institution, who says, actually, it can be done. And let me explain to you how it can be done. And I've done it for years in here and never had bad outcomes in years of how it can be done. And I think what I'm understanding your position to be is not only is there not a dispute of fact, but that her opinion as to that question, not the question of the fact, is even admissible. And his position establishes a fact as a matter of law. That just strikes me as odd. Well, I also think that the problem is with what Dr. Williams has to say. Again, it's not whether can a seat be used, right? It has to be a very fact-specific inquiry, right? And so can a seat be used in this instance? Can a seat be used with regard to Dr. Abdel-Sayed? And the conclusion, over and over again, was no. And absolutely, I think Dr. Pacheco's conclusion. Correct. Yes. Dr. Pacheco's conclusion. But I think, again, it's absolutely, and he said later on in the memo that NYU provided to support the reasons why they could not grant these accommodations. And he says in the end, I can't reconcile these things, right? How can I, how does this seat reconcile the fact that this is an individual who's experiencing pain and numbness in his upper arms? How does this seat reconcile the fact that his doctor is saying that he can't even do manual labor for prolonged periods of time and gives an example of typing? So why wasn't there an IME? Why didn't NYU establish, for its part, an IME? Because, as previously stated, we didn't believe that it was necessary in light of the admissions in the doctor's own medical reports. Any other questions? Could you talk a little bit about, we've talked a lot about the seated issue, and I confess I'm actually very interested in the other issue as well, the sort of scope of responsibilities that go with this position. Given that the facility was able to find a way to work without somebody in that facility capable of doing that university of procedures for a period of time, is that, doesn't that become definitive evidence of the ability to reasonably accommodate, and why not, I guess, if not? No. I think, first of all, what it does reflect is the hospital's attempt to make this work and the hospital's attempt and really wanting to give Dr. Abelsayed time to return. It was a temporary situation. And you have to go back to and understand the reasons why he was hired in the first place. And he was hired in the first place to move from this ongoing situation to a more long-call and outsourcing, because it simply wasn't working. It wasn't allowing them to provide the standard of care. So he was hired for that particular purpose, to put an end to that process. So we shouldn't compare the expectations of the existing ephemerologist at that facility to the expectation of Dr. Abelsayed, because he was hired with the expectation that he would have a greater scope of capability as to some of these more complex procedures. Absolutely. And I think the appropriate comparator would be the individual that replaced Dr. Abelsayed. And that individual absolutely can perform, you know, all of these procedures. Thank you. Thank you, counsel. Thank you. The one thing about these reasonable accommodation claims is there's so many moving parts and there's so many elements of the documents to consider. So let me just make it as simple as I can, consistent with the record. Even if the hospital had concerns about the plaintiff's capacity to do this work, those concerns were not so conclusive that they could deny the accommodation without any interactive process, without any independent research or investigation to support a direct threat defense, because his proposal was plausible. It's not plausible. It's not plausible to really show that the plaintiff can't do this. And what the defendant is really saying is the record on it, you know, conclusively supports direct threat without any further inquiry, without calling other hospitals to see how are you doing this, without doing research. But on the second issue, right, there isn't any of that. On the second issue, it's really what's for the essential duties of the job, because there's no dispute from your client that he can't perform a category of complex endoscopic procedures that require wearing the apron. And so why isn't that enough to support the decision not to accommodate? Because that's not an essential job function. And the district court said the record is not clear whether the leather smock requirement is an essential job function. But then the district court went on to say, having said that, it's still an undue burden. That's not the right analysis. If it's not an essential job function, and the record shows that it isn't because other people were really doing the work and he only did it at his discretion, if it's not essential, then it doesn't matter if his inability to do it creates an undue hardship on the hospital. We're do-no-vote here, right? So we're not following the district court's analysis. So I guess I'm poking a little bit at the district court's conclusion that there's a dispute effect as to whether it's an essential function. Well, here's the evidence that it's not an essential function. The hospital was outsourcing this work to four other doctors. That's in the plaintiff's affidavit at paragraph 25. That outsourcing did not change after the plaintiff began working there. The hospital didn't require him to perform them before he requested the accommodation. He rarely performed this work. It's not in his employment contract. And if he did do the ERCPs, it was at his discretion. So it's a jury question whether this is an essential job function. Now, I recognize there are cases that say we defer to management on essential functions, but that's not always enough to win summary judgment. If there's an issue of fact as to whether it's truly essential, and if it's not truly essential, then the question of whether his inability to do it creates an undue hardship falls away. That's where the district court got it wrong. You can't have both. You can't say it's an undue hardship because he can't perform an essential, a non-essential job function. Now, the question is, how is his inability to do it really an undue hardship for the hospital? That's the problem with the district court's analysis. Thank you.